J-S04009-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
CESAR PENA :
:
Appellant : No. 319 EDA 2024

Appeal from the Judgment of Sentence Entered December 14, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001123-2022

BEFORE: OLSON, J., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY OLSON, J.: **FILED FEBRUARY 5, 2025**

Appellant, Cesar Pena, appeals from the judgment of sentence entered

on December 14, 2023. We affirm.

The trial court ably summarized the underlying facts of this case:

> [L.D.V. (hereinafter "the Victim")], met [Appellant] via a
> Facebook dating website in early 2021. Over the course of a
> few months, they communicated via text messages and
> through the website. At the time, [the Victim] lived in
> Philadelphia and [Appellant] lived in Allentown.
>
> On the night of May 27, 2021, [the Victim] contacted
> [Appellant] via text message. She confided that she was
> upset (about a breakup with her ex-boyfriend) and needed a
> hug. Appellant expressed his desire to see [the Victim] and
> asked if he could visit later that night. [The Victim] agreed
> but told [Appellant]: "Not to have sex; just for a hug and
> [to] make me feel better." Appellant arrived at [the Victim's]
> apartment around 12:39 [a.m.] on May 28th. She greeted
> him in the parking lot and invited him up to her 3rd floor

_____

[*] Retired Senior Judge assigned to the Superior Court.

apartment. Once inside, they went to [the Victim's] bedroom. Her teenage son was sleeping in an adjoining bedroom when [Appellant] arrived.

[The Victim] stated that [Appellant] tried to kiss her. According to [the Victim], [Appellant] asked if he could lie down so they could "hug and relax." After lying down, she put her head on [Appellant's] shoulder. [The Victim] testified that [Appellant] eventually pulled her onto his lap, at which point he took his penis out of his pants and forced it into her vagina. [The Victim] said that she did not protest or resist, she just froze. She went on to state that, when [Appellant] pushed her head down toward his penis, she resisted. After that, they rolled over and [Appellant] was on top of [the Victim]. [The Victim] pushed [Appellant] away, and he ejaculated onto her stomach. Appellant tried to pry her legs open and have sex with her a [second] time, but [the Victim] started to cry and asked [Appellant] to leave. Appellant got dressed and left. [The Victim] went to [the] hospital and reported the [night's] events to the police shortly thereafter.

Appellant presented character evidence and testified in his own defense. In contract to [the Victim's] account, [Appellant] claimed that his interactions with her were consensual. Appellant denied initiating sex with [the Victim] and explained that he just followed her lead.

Trial Court Opinion, 5/10/24, at 1-2 (citations omitted).

Following trial, the jury found Appellant guilty of sexual assault[1] and, on December 14, 2023, the trial court sentenced Appellant to serve a term of 11 ½ to 23 months in jail, with a concurrent term of seven years of probation, for this conviction.

Appellant filed a timely notice of appeal. He raises one claim on appeal:

---

[1] 18 Pa.C.S.A. § 3124.1.

> Was there sufficient evidence to prove the *mens rea* and *actus* [*reus*] of sexual assault under [18 Pa.C.S.A. § 3124.1] beyond a reasonable doubt?

Appellant's Brief at 2 (some capitalization omitted).

Appellant claims that the evidence was insufficient to support his conviction. We review Appellant's sufficiency of the evidence challenge under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Callen***, 198 A.3d 1149, 1167 (Pa. Super. 2018) (citations and quotation marks omitted).

Appellant was convicted of sexual assault under 18 Pa.C.S.A. § 3124.1. In relevant part, this section provides:

> a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual

intercourse with a complainant without the complainant's consent.

18 Pa.C.S.A. § 3124.1. "Resistance to sexual assault is not required to sustain a conviction." ***Commonwealth v. Smith***, 863 A.2d 1172, 1176 (Pa. Super. 2004); ***see also*** 18 Pa.C.S.A. § 3107. "Furthermore, the uncorroborated testimony of the complaining witness is sufficient to convict a defendant of sexual offenses." ***Commonwealth v. Cramer***, 195 A.3d 594, 602 (Pa. Super. 2018).

On appeal, Appellant claims that the evidence was insufficient to prove that he acted "without the [Victim's] consent." Appellant's Brief at 8. This claim fails.

The Victim testified that she invited Appellant over to her house for "a big hug and no words." N.T. Trial, 9/6/23, at 42. She testified that Appellant accepted her offer and that Appellant further specified that he was going to come over to her house "not to have sex; just for a hug and make [the Victim] feel better." ***Id.*** at 43.

The Victim testified that, when Appellant arrived at her house that night, "we went directly into my room because my house doesn't have a living room." ***Id.*** at 46. She testified:

> Q: After you and [Appellant] went to your bedroom, what happened next?
>
> [The Victim]: He said that he had a headache and asked if he could turn the light off.
>
> Q: What did you do?

[The Victim]: I turned the light off. I sat down next to him. He said -- and then he said his feet hurt and asked if he could take off his boots.

Q: Did he take off his boots?

[The Victim]: Yes.

Q: You said you sat down next to [Appellant]. Where were you two sitting?

[The Victim]: On the edge of the bed.

. . .

Q: And what happened after you sat down next to [Appellant] on the bed?

[The Victim]: He tried to kiss me on the mouth. I turned my head and he kissed me close to my lips.

Q: Did you say anything to him at that time?

[The Victim]: I don't remember.

Q: What is the next thing that happened?

[The Victim]: He asked if we could lie down higher up on the bed so he could give me a hug and relax.

Q: Did you lay down on the bed, too?

[The Victim]: I rested my head on his shoulders.

Q: Once you rested your head on his shoulder, what happened next?

[The Victim]: He grabbed me by my shoulders and he pushed me onto his lap so that he could see me face-to-face.

Q: What happened next?

[The Victim]: He took his penis out of his pants without taking his pants off.

. . .

Q: What did [Appellant] do next?

[The Victim]: He forced his penis into my vagina by moving my clothes to the side.

Q: . . . [Did] you want [Appellant] to put his penis in your vagina?

[The Victim]: No.

Q: Did you give [Appellant] consent to put his penis in your vagina?

[The Victim]: No.

Q: After [Appellant] put his penis in your vagina, what did he do next?

[The Victim]: I was basically frozen. I couldn't move and I told him that is not okay.

Q: Did he say anything back to you when you told him that wasn't okay?

[The Victim]: He said don't worry about it.

Q: What did he do next?

[The Victim]: He pulled me by my hair. He put his penis in my mouth.

. . .

Q: Did you want [Appellant] to put the penis in your mouth?

[The Victim]: No.

Q: Did you give [Appellant] consent to put it in your mouth?

[The Victim]: No.

Q: Once he brought your head to his penis, what did he do next?

[The Victim]: Because I was resisting because I didn't want to do it, he pushed me on to the bed by my shoulders.

Q: When you say you were resisting, what do you mean by that?

[The Victim]: That he grabbed me again by my hair and to push my head and I resisted. I resisted.

. . .

Q: And after you resisted and he pushed you, what happened next?

[The Victim]: Again he put his penis in my vagina.

Q: How were you? How was your body positioned when he did that?

[The Victim]: I was lying on the bed . . . faceup.

. . .

Q: And how was [Appellant] positioned?

[The Victim]: He was on top of me.

Q: What happened next?

[The Victim]: He was about to ejaculate and I pushed him.

Q: How did you push him?

[The Victim]: On his chest.

. . .

Q: After you pushed him, what happened next?

[The Victim]: He ejaculated in the area of my stomach.

Q: After he ejaculated on to your stomach, what did you do next?

[The Victim]: I had a towel that I been using to clean my tears and I used that to clean myself.

Q: You mentioned tears, ma'am. Were you crying while this was happening?

[The Victim]: Before he arrived I had been crying.

Q: Did you begin crying while [Appellant] was doing these things to you?

[The Victim]: I started crying harder when he tried again to put his penis in my vagina.

. . .

Q: Did you say anything to him at that time?

[The Victim]: I started crying harder and I closed my legs and I said that what he did was rape.

Q: What did he say when you said that?

[The Victim]: He got nervous.

Q: Did he say anything back?

[The Victim]: That everything was going to be okay.

*Id.* at 47-52.

The above testimony was sufficient to prove that Appellant had "sexual intercourse . . . with [the Victim] without the [Victim's] consent." ***See*** 18 Pa.C.S.A. § 3124.1. To be sure, the Victim testified: that she specifically invited Appellant over to her house "not to have sex[,] just for a hug;" that she never consented to having sex with Appellant; and, that, when Appellant

- 8 -

put his penis in her vagina, she told Appellant "that is not okay." N.T. Trial, 9/6/23, at 47-49; **see also** N.T. Trial, 9/6/23, at 47-52. Appellant's claim that the Commonwealth failed to prove the Victim's lack of consent thus fails.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/05/2025